IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

J.E. DUNN CONSTRUCTION CO.      :

                               :

    v.                         :   Civil Action No. DKC 11-1948

                               :

S.R.P. DEVELOPMENT LIMITED
PARTNERSHIP, et al.            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this contract dispute is a motion to dismiss filed by Defendants S.R.P. Development Limited Partnership ("SRP"), the Smoot Corporation ("Smoot"), and Robuck Investments, Inc. ("Robuck"). (ECF No. 12). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be granted in part and denied in part.

## I.   Background

Plaintiff J.E. Dunn Construction Company ("JE Dunn") commenced this action by filing a complaint on July 15, 2011, alleging breach of contract, negligence, and related claims against SRP, Smoot, and Robuck (collectively, "Defendants"). The complaint recites that on September 29, 2005, Metropolitan Baptist Church ("Metropolitan") contracted with SRP ("the prime contract") to build a church in Upper Marlboro, Maryland ("the

Project"). (ECF No. 1 ¶ 10). SRP then "represented to JE Dunn that it was willing to contract with JE Dunn to perform the work under the [the prime contract] for a cost, plus fee with a guaranteed maximum price and that such agreement would be consistent with [the prime contract]." (*Id.* at ¶ 17). On November 29, 2005, JE Dunn and SRP entered into "a modified AIA A491–1996 Agreement Between Design/Builder and Contractor" ("the subcontract") pursuant to which "JE Dunn was to supply certain labor and materials to construct portions of the Project." (*Id.* at ¶ 13).[1]

On or about August 6, 2008, Metropolitan terminated the prime contract with SRP, allegedly "as a result of negligent misrepresentations made to Metropolitan by SRP regarding the scope and cost of the Project." (*Id.* at ¶ 17). On August 18, 2008, SRP terminated the subcontract, without cause. (*Id.* at ¶ 16). The subcontract provided, upon termination without cause, that JE Dunn was entitled to recover:

> the Cost of the Work completed to date [of the termination], less payments made to date [of the termination], plus the cost of demobilizing and canceling existing subcontracts, material contracts and purchase orders and [JE Dunn's] fee shall be calculated as if the Work had been fully

---

[1] The American Institute of Architects produces AIA form contracts for use in construction. They are the most widely used construction contracts and are familiar to most entities in the construction industry. *See College of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.,* 132 Md.App. 158, 174 (2000).

> completed[,] . . . including [a] reasonable
> estimate of the Cost of the Work not
> actually completed.

(*Id.* at ¶ 19).   When SRP failed to pay for the work performed

prior to termination of the subcontract, JE Dunn filed the

instant suit, alleging breach of contract, negligence, negligent

misrepresentation, and related claims.

On December 12, 2011, Defendants filed a motion to dismiss

for lack of subject matter jurisdiction or, in the alternative,

for failure to state a claim.   (ECF No. 12).   JE Dunn opposed

that motion on January 9, 2012 (ECF No. 15), and Defendants

replied on February 6 (ECF No. 19).[2]

## II.  Analysis

Defendants argue that the complaint should be dismissed for

three reasons.   First, they contend that the subcontract

incorporates the terms of a general conditions agreement between

SRP and Metropolitan, which requires mediation as a condition

precedent to arbitration or filing a law suit.   According to

Defendants, JE Dunn's failure to satisfy this condition warrants

dismissal of the case pursuant to Fed.R.Civ.P. 12(b)(1).

Secondly, Defendants contend that the complaint "fails to allege

any facts establishing that [Smoot and Robuck] have any

---

[2] JE Dunn filed a motion to file a surreply on February 7,
2012.   (ECF No. 20).   Because the issues that JE Dunn wishes to
address will be resolved in its favor, the motion will be denied
as moot.

involvement in the occurrences giving rise to this litigation, and therefore fails to state a claim upon which relief can be granted" as to those defendants. (ECF No. 12-1, at 7). Finally, Defendants argue that "JE Dunn fails to set forth a cognizable claim upon which relief can be granted for its negligence and negligent misrepresentation causes action." (*Id.* at 8).

### A.   Failure to Satisfy a Condition Precedent

The complaint recites that JE Dunn and SRP entered into "a modified AIA A491-1996 Agreement Between Design/Builder and Contractor" (ECF No. 1 ¶ 13), but the subcontract itself is not attached. Defendants' motion to dismiss refers to and attaches a document entitled "AIA Document A491-1996 Part 2 Standard Form of Agreement Between Design/Builder and Contractor." (ECF No. 12-3). In its opposition papers, JE Dunn agrees that this document is the baseline subcontract – albeit with a missing page – but contends that certain attachments have not been provided. (ECF No. 15, at 15 n. 22). SRP subsequently filed a complete version of the same document it attached to its motion to dismiss. (ECF No. 21-1). There appears to be no dispute as to the authenticity of this document.

Defendants also attach to their motion a document entitled "AIA Document A201-1997 General Conditions of the Contract for

Construction."   (ECF No. 12-2).   This document contains two broad alternative dispute resolution provisions:

> 4.5.1   Any Claim arising out of or related to the Contract . . . shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.
>
> . . . .
>
> 4.6.1   Any Claim arising out of or related to the Contract . . . shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.   Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

(ECF No. 12-2 ¶¶ 4.5.1, 4.6.1).

Defendants argue that the plain language on the cover page of the subcontract incorporates the general conditions set forth in AIA Document A201-1997.   Specifically, the cover page recites:

> AIA Document A201, General Conditions of the Contract for Construction, is adopted in this Part 2 Agreement by reference.   Do not use with other general conditions unless this document is modified.

(ECF No. 21-1, at 1).   Defendants further contend that § 1.1.1 of the subcontract incorporates AIA Document A201-1997.   That section provides:

> The Contract Documents consist of the Drawings, Specifications and other documents identified in Article 15; the Contractor's proposal as accepted by the Design/Builder, a copy of which is attached to this Agreement as Exhibit A; this Agreement/Contract; Conditions of the Contract (General, Supplementary and Other Conditions) issued prior to the execution this Agreement; and Modifications and construction documents issued after execution of this Agreement.

(*Id.* at § 1.1.1). According to Defendants, these two references are sufficient to incorporate AIA Document A201-1997 and the alternative dispute resolution clauses contained therein.

In response, JE Dunn argues that AIA software would not permit modification of the cover page and that the "boilerplate" introductory language should not be used to contradict the portions of the contract that the parties were able to – and extensively did – modify. (ECF No. 15, at 12). As evidence that the subcontract was not intended to incorporate the general conditions of the prime contract, Defendants point out that AIA Document A201-1997 was not listed in Article 15 of the subcontract, entitled "Enumeration of Contract Documents." (ECF No. 21-1, at 14). That Article provides, in relevant part:

> § 15.1    The Contract Documents, except for Modifications issued after execution of this Agreement, include the documents listed in this Article.

> § 15.1.1  Not used.

>     § 15.1.2  The Conditions of the Contract are
>     as follows . . . To be added by Amendment.

(*Id.* at §§ 15.1 – 15.1.2).  JE Dunn attaches to its opposition papers what it asserts is an unmodified version of the subcontract.  That document recites, at § 15.1.1, "The General Conditions are the General Conditions of the Contract for Construction, AIA Document A201, current as of the date of this agreement."  According to JE Dunn, the fact that the subcontract indicates that § 15.1.1 is "not used" is clear "evidence of the parties' intention not to use the AIA A201 as the general conditions of [the subcontract]."  (ECF No. 15, at 19).

In their reply papers, Defendants contend that JE Dunn could have manually deleted the recital on the cover page if the parties did not intend to incorporate AIA Document A201-1997.  (ECF No. 19, at 2).  They provide no explanation, however, as to why the subcontract states that the conditions of the contract were to be "added by [a]mendment," nor have they provided any supplementary conditions.[3]

---

[3]  Defendants argue for the first time in their reply memorandum that an arbitration clause found in § 12.4 of the subcontract is applicable.  "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."  *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006).  In any event, the arbitration clause cited by Defendants applies only to disputes regarding the amount of a "final payment," which is triggered when (1) the subcontract "has been fully performed"; (2) "a final Application for Payment and a final accounting for

Courts have disagreed as to the proper standard to be applied in considering a motion to dismiss for failure to engage in alternative dispute resolution as a condition precedent to filing suit. Some have found that such an omission constitutes a jurisdictional defect, *see Tattoo Art, Inc. v. TAT Int'l, LLC*, 711 F.Supp.2d 645, 651 (E.D.Va. 2010) (citing cases), while others have held that "the question of subject matter jurisdiction is analytically distinct from that of failure to satisfy conditions precedent to suit," *N-Tron Corp. v. Rockwell Automation, Inc.*, No. 09-0733-WS-C, 2010 WL 653760, at *4 (S.D.Ala. Feb. 18, 2010); *see also Harris v. Amoco Production Co.*, 768 F.2d 669, 680 (5th Cir. 1985) ("while the failure to comply with a condition precedent usually means that a plaintiff cannot bring suit . . . , it does not mean that the district court lacks subject matter jurisdiction"). Regardless of the applicable standard of review, the instant record does not support that the subcontract incorporates the alternative dispute resolution provisions of AIA Document A201-1997.

By itself, the introductory language in the subcontract is insufficient to incorporate AIA Document A201-1997. Under Maryland contract law, courts look to the body of an agreement,

_____

the Cost of the Work" have been submitted and reviewed; and (3) "a final Certificate for Payment has then been issued." (ECF No. 21-1 § 12.1). There is no indication in the current record that any of those events has occurred.

8

not the introduction alone, to determine the meaning of a
contract. *See Pulaski v. Riland,* 199 Md. 426, 431 (1952) ("we
must look to the operative part of the agreement to find out
what the parties actually did"); *see also Wilson v. Towers,* 55
F.2d 199, 200 (4th Cir. 1932) (courts may look to introductory
language to resolve ambiguity, but not to create it).  This
practice is consistent with case law from other jurisdictions
interpreting AIA form contracts.[4]  Indeed, other courts have
found that an introductory recital to an AIA contract, standing
alone, is insufficient to incorporate another document.
*Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co.,* 83 F.3d
897, 899 (7th Cir. 1996) (aside from introductory language,
"[n]othing in the body of the agreement requires that the
parties incorporate A201/CM, or indicates that the parties
themselves have chosen to do so"); *Hartford Fire Ins. Co. v.
Henry Bros Const. Management Services, LLC.,* No. 10-4746, 2011
WL 3563138, at *6 (N.D.Ill. Aug. 10, 2011) (finding introductory
language alone was "not the 'clear and specific' language that
Illinois law requires to incorporate another document");
*Heitritter v. Callahan Constr. Co.,* 670 N.W.2d 430, 2003 WL
22015970, at *4 (Iowa App. Aug. 27, 2003) ("Preliminary recitals

---

[4] Maryland courts have not interpreted AIA form contracts in
a way that aids the court's analysis.  Thus, analysis of
Maryland contract law principles will be supplemented by an
examination of how other courts have interpreted AIA form
contracts.

of an agreement do not become binding obligations unless so referred to in the operative portion of the instrument as to show a design they should form a part of it"); *Webb v. Children's Oncology Serv. of L.A.,* No. 88-2173, 1989 WL 92461, at *1 (E.D.La. Aug. 9, 1989) (the "preamble" of an AIA contract is the language that "precedes the term 'Agreement'").

In the instant case, the recital relied upon by Defendants is located on the cover page of the subcontract.  The second page, after the preamble, provides, "[SRP] and [JE Dunn] agree as set forth below."  (ECF No. 21-1, at 2).  The body of the contract, which contains the terms of the parties' agreement, does not specifically refer to AIA Document A201-1997; rather, it provides that the conditions of the contract are "to be added by [a]mendment."  (*Id.* at 14).  Neither party has provided any amendment to the subcontract.

The language contained in § 1.1.1 is also inadequate to incorporate AIA Document A201-1997.  That section provides that "[t]he Contract Documents consist of . . . Conditions of the Contract (General, Supplementary and Other Conditions)."  In *Atlantic Mutual*, 83 F.3d at 900, the United States Court of Appeals for the Seventh Circuit expressly rejected the proposition that identical language contained in a similar AIA form contract incorporated the general conditions of another contract.  In reversing the district court's grant of summary

10

judgment, the court reasoned, in part, "nothing in Article 1 refers to A201/CM.  Article 1 only refers to Conditions of the Contract. . . . [T]here is no requirement that contracting parties using [the subcontract] incorporate A201/CM as the parties' general conditions."  *Id.* at 900.  The court asked rhetorically, "If A201/CM provides the 'General' conditions of the contract, where are the 'Supplementary' and 'other' conditions expressly mentioned in Article 1?" then answered, "We cannot find them anywhere.  Were we to adopt the [defendants'] interpretation of Article 1, we would necessarily be incorporating additional documents that apparently do not exist."  *Id.*

In the instant case, § 1.1.1 does not define the documents that constitute the general conditions of the subcontract.  The only specific language in the body of the subcontract regarding general conditions is provided in Article 15, which recites that the conditions of the contract will be "added by [a]mendment." Indeed, neither Article 1 nor Article 15 refers to AIA Document A201-1997.  Additionally, the court has not been presented with any supplementary conditions, which, if the court were to accept Defendants' reading of § 1.1.1, would be incorporated as well.

Finally, the subcontract, which has been extensively modified, appears to contain no reference to "general conditions" beyond those found in § 1.1.1.  The unmodified

version of AIA Document A491-1996 contains seventeen references
to clauses found in AIA Document A201-1997.   In the parties'
subcontract, all references outside of § 1.1.1 have been
removed.   Moreover, in at least two instances – at §§ 14.2 and
14.4 – whole portions of AIA Document A201-1997 have been copied
and placed in the body of the agreement.   This suggests that the
parties did not intend to incorporate AIA Document A201-1997,
but rather to import certain sections by writing them into the
subcontract itself.

In sum, Defendants have not shown that the alternative
dispute resolution clauses in §§ 4.5.1 and 4.6.1 of AIA Document
A201-1997 were incorporated into the subcontract at issue in
this case.   Accordingly, their motion to dismiss for failure to
satisfy a condition precedent will be denied.

**B.   Failure to State a Claim**

**1.   Standard of Review**

The purpose of a motion to dismiss is to test the
sufficiency of the complaint.  *Presley v. City of
Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006).   A
plaintiff's complaint need only satisfy the standard of Rule
8(a), which requires a "short and plain statement of the claim
showing that the pleader is entitled to relief."   Fed.R.Civ.P.
8(a)(2).   "Rule 8(a)(2) still requires a 'showing,' rather than
a blanket assertion, of entitlement to relief."  *Bell Atl. Corp.*

*v. Twombly,* 550 U.S. 544, 555 n. 3 (2007).   That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal marks and citations omitted).

At this stage, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268, (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993)).   In evaluating the complaint, the court need not accept unsupported legal allegations.   *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989).   Nor must it agree with legal conclusions couched as factual allegations, *Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"   *Iqbal,* 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).   Thus, "[d]etermining whether a complaint states a

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

   **2.   The Smoot Corporation and Robuck Investments, Inc.**

   Defendants contend that JE Dunn has not pled sufficient facts demonstrating that SRP's general partners, corporations Smoot and Robuck, had "any involvement in the occurrences giving rise to this litigation," and that these corporate defendants should, therefore, be dismissed.  (ECF No. 12-1, at 7).

   In response, JE Dunn identifies several allegations in the complaint relating to Smoot and Robuck:

> JE Dunn has alleged that Smoot and Robuck
> "transacted business and performed work and
> service in Maryland under several contracts
> related to the subject construction project"
> in their capacity as general partners of
> SRP.  [ECF No. 1 ¶ 8].  JE Dunn has further
> alleged that it contracted with SRP "by and
> through" that entity's general partners
> Smoot and Robuck.  [*Id.* at ¶ 23].  The
> Complaint likewise alleges that Smoot and
> Robuck participated in requesting JE Dunn to
> perform the services at the heart of this
> litigation, and that Robuck and Smoot
> accepted JE Dunn's performance and were on
> notice of JE Dunn's expectation of payment.
> [*Id.* at ¶¶ 29-31, 34].  Finally, JE Dunn has
> alleged that Smoot and Robuck made promises
> to pay to JE Dunn the amounts sought in this
> action.  [*Id.* at ¶¶ 37, 39].

(ECF No. 15, at 28 (internal brackets added; footnotes removed).

JE Dunn further contends that, as general partners of SRP, Smoot

and Robuck are liable for all of SRP's obligations. (*Id*. at 29).

There appears to be no dispute that Smoot and Robuck are general partners of SRP, an Ohio limited partnership. Under Ohio law, "[a] partnership is an entity distinct from its partners." Ohio Rev. Code Ann. § 1776.21(A). Pursuant to § 1776.36(A), absent exceptions not applicable here, "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." Section 1776.37, entitled "Actions by or against partnership," provides:

> (A) A partnership may sue and be sued in the name of the partnership.
>
> (B) An action may be brought against the partnership and, to the extent not inconsistent with section 1776.36 of the Revised Code, any or all of the partners in the same action or in separate actions.
>
> (C) A judgment against a partnership is not by itself a judgment against a partner. A judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against the partner.
>
> (D) A judgment creditor of a partner may not levy execution against the assets of a partner to satisfy a judgment based on a claim against the partnership unless the partner is personally liable for the claim under section 1776.36 of the Revised Code and any of the following apply:

15

(1) A judgment based on the same claim was obtained against the partnership and a writ of execution on the judgment was returned unsatisfied in whole or in part;

(2) The partnership is a debtor in bankruptcy;

(3) The partner agreed that the creditor need not exhaust partnership assets;

(4) A court grants permission to the judgment creditor to levy execution against the assets of a partner based on a finding that partnership assets subject to execution are clearly insufficient to satisfy the judgment, that exhaustion of partnership assets is excessively burdensome, or that the grant of permission is an appropriate exercise of the court's equitable powers;

(5) Liability is imposed on the partner by law or contract independent of the existence of the partnership.

The official comments to the Revised Uniform Partnership Act ("RUPA"), which has been adopted in Ohio, explain that "[s]ubsection (d) requires partnership creditors to exhaust the partnership's assets before levying on a judgment debtor partner's individual property where the partner is personally liable for the partnership obligation under [§ 1776.36(A)]." Revised Uniform Partnership Act (1997), § 703, cmt. 4. This rule "respects the concept of the partnership as an entity and makes partners more in the nature of guarantors than principal debtors on every partnership debt." *Id.* Although the RUPA was adopted in Ohio relatively recently, these principles appear to

be consistent with Ohio law before it became effective. *See Pension Ben. Guar. Corp. v. East Dayton Tool and Die Co.,* 14 F.3d 1122, 1128 (6th Cir. 1994) ("Before a creditor can seek [a] partners' individual assets, Ohio law requires a specific determination that partnership assets are insufficient to meet partnership debts."); *Wayne Smith Construction Co. v. Wolman, Duberstein & Thompson,* 604 N.E.2d 157, 163 (Ohio 1992) ("partners are not primarily liable for the contractual obligations incurred by their firm. A partnership creditor in proceedings in execution of a judgment against the partnership must first exhaust partnership property before resorting to the personal assets of partners."). Thus, Smoot and Robuck, as SRP general partners, may be liable for any outstanding obligation after exhaustion of SRP's assets and, for that reason, are proper parties to this suit.

JE Dunn has failed, however, to plead sufficient facts demonstrating that either Smoot or Robuck may be independently liable for the underlying causes of action. Although the complaint recites that "JE Dunn entered into [the subcontract] by and through" Smoot and Robuck (ECF No. 1 ¶ 21), neither of those entities was a signatory to the subcontract. Moreover, the complaint does not allege that Smoot or Robuck owed any duty to JE Dunn at the time the subcontract was formed. Because Smoot and Robuck may not be held individually liable, JE Dunn

may not satisfy any judgment against them without first
exhausting the assets of SRP.

### 3. Negligence and Negligent Misrepresentation

The last two counts of the complaint are labeled negligent
misrepresentation and negligence.[5]    SRP challenges only the
sufficiency of the allegation, required for either claim under
Maryland law, that JE Dunn was owed a legally cognizable duty by
SRP.  *See, e.g., Jacques v. First Nat'l Bank of Md.*, 307 Md.
527, 532 (1986) (negligence); *Martens Chevrolet, Inc. v. Seney*,
292 Md. 328, 336-37 (1982) (negligent misrepresentation).   JE
Dunn alleges in its complaint that SRP owed it a duty both "to
make accurate statements to JE Dunn regarding the project both
during precontractual negotiations and after the parties entered
into the SRP Subcontract," and "to manage the Project in a
responsible manner and in accordance with industry standard[s],"
which required SRP "to communicate accurate and material
information to JE Dunn and Metropolitan regarding the cost and
scope of the work."  (ECF No. 1 ¶¶ 42 and 49).   Defendants
argue that the claims for negligence and negligent
misrepresentation must be dismissed because "JE Dunn raises no
legal obligation owed to it by the defendants other than those
based in contract."  (ECF No. 12-1, at 8).

---

[5] Both are labeled "Count V" and seek the same measure of
damages.

Under Maryland law, a duty in tort will be imposed only if the nature of the relationship and transaction between the parties so dictate.   In the context of negligence and negligent misrepresentation, Maryland courts have found that where, as here, "the failure to exercise due care creates a risk of economic loss only, an intimate nexus between the parties [i]s a condition to the imposition of tort liability." *Superior Bank, F.S.B. v. Tandem Nat. Mortg., Inc.*, 197 F.Supp.2d 298, 320 (D.Md. 2000) (citing *Jacques*, 307 Md. at 534) (internal marks omitted).   An "intimate nexus" requires "contractual privity or its equivalent," and will turn on the closeness of the parties' relationship. *Id.; see also Tischler v. Baltimore Bancorp*, 801 F.Supp. 1493, 1505 (D.Md. 1992) (noting that "an 'intimate nexus' cannot exist unless a defendant is aware of a specific party or class of parties which intend to rely upon the defendant's statement") (citing *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1062 (S.D.N.Y. 1989)).   In addition to contractual privity, courts have found an intimate nexus between parties engaged in pre-contract negotiations. *See Griesi Atlantic General Hosp. Corp.*, 360 Md. 1, 13 (2000); *Weisman v. Connors*, 312 Md. 428, 446 (1988); *Martens Chevrolet*, 292 Md. at 331-38; *L & P Converters, Inc. v. Alling & Cory Co.*, 100 Md.App. 563, 570-71 (1994).

Maryland courts have consistently held that parties conducting pre-contractual negotiations owe a duty to speak with reasonable care.  *See Griesi,* 360 Md. at 19-20; *Brock Bridge Ltd. Partnership, Inc. v. Development Facilitators, Inc.*, 114 Md.App. 144, 163 (1997).  In *Griesi,* a hospital made an offer to a job applicant, specifying a starting date and the scope of responsibilities, when the job position had already been filled by another applicant.  The hospital then rescinded its offer of employment and the applicant sued, alleging negligent misrepresentation during the course of contract negotiations. Holding that the hospital owed a duty to speak with reasonable care during pre-contractual negotiations, the Court of Appeals of Maryland reasoned that pre-contractual negotiations are a "business transaction, where a special relationship may develop giving rise to a duty to exercise reasonable care in facilitating the transaction." *Griesi*, 360 Md. at 15-16. During such negotiations, the employer necessarily must provide "relevant and accurate information" and "reasonably should foresee that negligent misrepresentation of employment information may result in economic harm to the prospective employee." *Id.* at 16 (citing *Weisman*, 312 Md. at 449). Similarly, in *Brock Bridge,* 114 Md.App. at 148, the defendant was an engineering company employed to help construct roadside improvements in a housing development.  Pre-contractual

representations were made that the costs to the developer would not exceed $70,000. In fact, the cost of the project exceeded $250,000. The trial court dismissed the plaintiffs' negligence claims, reasoning that "no duty to guarantee future costs which may arise and which may exceed estimated costs arises as a duty of care outside a contractual agreement to guarantee such overages." *Id.* at 152. The Court of Special Appeals of Maryland reversed, however, holding that the plaintiffs "were entitled to rely on this estimate to a reasonable extent and to recover for damages incurred because of this reliance." *Id.* at 163. The appellate court found that the defendant's "cost estimate . . . was an 'estimate by one knowledgeable in a particular field'" and that the plaintiffs were "entitled to rely on this estimate to a reasonable extent and to recover for damages incurred because of this reliance, even though the representation (assuming it was negligently made) encompassed future events." *Id.* at 162-63 (citing *Ward Development, Inc. v. Ingrao*, 63 Md.App. 645, 656 (1985)); *see also Martin Marietta Corp. v. International Telecomm. Satellite Org.*, 991 F.2d 94, 99 (4th Cir. 1992) (under Maryland law, "[a] party to a contract cannot, by misrepresentation of material fact, induce the other party to the contract to enter into it to his damage." (quoting *Martens Chevrolet*, 292 Md. at 539 n. 7)).

Here, JE Dunn has alleged that SRP owed a duty to make accurate statements prior to the time the parties entered into the subcontract.   The complaint recites that SRP had exclusive control of vital information that was necessary for JE Dunn to understand necessary details.   Indeed, JE Dunn was not a party to the Metropolitan-SRP prime contract and it was entitled to rely to a reasonable extent on SRP's representations as to the content of that contract.   Thus, to the extent that JE Dunn alleges negligent misrepresentation based on pre-contractual negotiations that induced it to enter into the subcontract, Maryland law supports that it was owed an independent duty that SRP's representations be accurate and the allegations in the first Count V for negligent misrepresentation are sufficient in the pre-contractual phase.

On the other hand, it is a "fundamental principle" of Maryland law that "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'"   *Flow Industries, Inc. v. Fields Constr. Co.*, 683 F.Supp. 527, 530 (D.Md. 1988) (quoting *Heckrotte v. Riddle*, 224 Md. 591, 595 (1961)); *see also Mesmer v. Md. Auto. Ins. Fund,* 353 Md. 241, 254 (1999) ("negligent breach of a contract, absent a duty or obligation imposed by a source independent of that arising out of the contract itself,

is not enough to sustain an action sounding in tort") (quoting
*Board of Educ. v. Plymouth Rubber Co.*, 82 Md.App. 9, 31 (1990)).
To find that "a contractual relationship itself provides the
duty of care necessary for the maintenance of a negligent
misrepresentation claim would be to turn this principle into a
syllogism" because "[t]he contract, in effect, would become an
'independent duty imposed by law.'" *Flow Industries*, 683
F.Supp. at 530. Thus, a "duty giving rise to a tort action must
have some independent basis." *Mesmer*, 353 Md. at 253.
Ultimately, the "essential question" in this analysis is
"whether the plaintiff's interests are entitled to legal
protection against the defendant's conduct," and "no universal
test for [imposition of a duty] ever has been formulated."
*Jacques*, 307 Md. at 532-33 (internal marks and citation
omitted).

Under certain situations, Maryland courts have recognized
that parties to a contract have legal obligations beyond the
scope of the obligations in the contract. For example, in
*Jacques*, 307 Md. at 540, the court held that a bank owed a duty
to process a loan with reasonable care, focusing on the extent
to which the plaintiff was "particularly vulnerable and
dependent upon the Bank's exercise of due care." In so ruling,
the court explained that "[t]he law generally recognizes a tort
duty of due care arising from contractual dealings with

professionals such as physicians, attorneys, architects, and public accountants." *Id.* at 541.

Courts have been hesitant, however, to impose tort duties on sophisticated parties that have otherwise outlined their legal obligations through contract.  In *Martin Marietta Corp,* 991 F.2d at 95-96, the defendant agreed to launch a satellite for the plaintiff and the launch failed, allegedly due to the defendant's negligence.  The court held that the defendant did not owe a legal duty beyond what was enumerated in the contract, reasoning that "[e]qually sophisticated parties who have the opportunity to allocate risks to third party insurance or among one another should be held to only those duties specified by the agreed upon contractual terms and not to general tort duties imposed by state law."  *Id.* at 98; *see also CapitalSource Finance LLC v. Pittsfield Weaving Co.,* 571 F.Supp.2d 668, 674 (D.Md. 2006) ("Under Maryland law, 'a claim for negligent misrepresentation is improper when . . . the only relationship between the parties is contractual, both parties are sophisticated, and the contract does not create an express duty of due care in making representations'" (quoting *Martin Marietta*, 991 F.2d at 98)); *Rotorex Co., Inc. v. Kingsbury Corp.,* 42 F.Supp.2d 563, 575 (D.Md. 1999) ("In a case involving a commercial transaction such as the one at issue here, the remedies provided . . . in the contract are exclusive."); *Blue*

24

*Circle Atlantic, Inc. v. Falcon Materials, Inc.,* 760 F.Supp. 516, 519 (D.Md. 1991) ("a claim of negligent misrepresentation causing economic loss in the course of a commercial transaction or relationship, at least where the parties are merchants, ought not be entertained" (internal citation omitted)); *Flow Industries, Inc.,* 683 F.Supp. at 530 ("Where . . . the controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businessmen, it is plainly contract law which should provide the rules and principles by which the case is to be governed."); cf. *Cooper v. Berkshire Life Ins. Co.,* 148 Md.App. 41, 86 n. 8 (2002) (distinguishing between finding a duty for negligent misrepresentation between sophisticated parties in pre-contractual and post-contractual dealings).

An unpublished decision of the Fourth Circuit illustrates these principles in the construction context.  In *Architectural Systems, Inc. v. Gilbane Bldg. Co.,* 974 F.2d 1330, 1992 WL 214446 (4th Cir. 1992) (Table), the prime contractor misrepresented to a subcontractor the project owner's ability to pay, and the subcontractor alleged that the prime contractor owed a duty to disclose certain information during the course of the contract.  The Fourth Circuit disagreed, holding that, in the construction industry, "[n]o extracontractual duty of disclosure arises."  *Id.* at *5.  The court reasoned that "the

25

parties were equally sophisticated in general business affairs," *id.* at *6, and "were free to define contractually their respective rights and liabilities," *id.* at *4.   Notably, it distinguished *Jacques* by explaining that subcontractors are not particularly vulnerable and that the "construction industry is not similar to the banking industry in its relation to public welfare."  *Id.* at *5.

In the instant case, JE Dunn has not alleged facts showing that, once the contract was formed, SRP was under an obligation beyond those contained in the subcontract to manage the project in a professional manner.   Construction contracts and subcontracts are detailed agreements allocating responsibility and risk.   The parties, both sophisticated professionals with experience in construction projects and contracts, were free to allocate duties and risks amongst themselves – indeed, they did so in the subcontract itself.   Thus, JE Dunn's tort claims for both negligence and negligent misrepresentation based on an alleged duty to manage the project in accordance with industry standards or to make accurate representations after the subcontract was signed cannot be sustained.

## III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Court